**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: : | |
| : | **Chapter 11** |
| **NORTH PHILADELPHIA HEALTH SYSTEM** : | |
| **d/b/a GIRARD MEDICAL CENTER** : | **Case No. 16-18931 (MDC)** |
| **d/b/a GOLDMAN CLINIC** : | |
| **d/b/a ST. JOSEPH'S HOSPITAL,** : | **Hearing Date: April 25, 2018** |
| : | **Hearing Time: 11:00 a.m.** |
| **Debtor.** : | **Hearing Place: Courtroom 2** |
| : | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO THE APPROVAL OF THE DEBTOR'S DISCLOSURE STATEMENT
AND TO THE MOTION OF THE DEBTOR FOR ENTRY OF AN
ORDER APPROVING DISCLOSURE STATEMENT**

The Official Committee of Unsecured Creditors (the "Committee") of the Bankruptcy

estate of North Philadelphia Health System d/b/a Girard Medical Center d/b/a Goldman Clinic

d/b/a St. Joseph's Hospital (the "Debtor" or "NPHS"), by and through its undersigned counsel,

Obermayer Rebmann Maxwell & Hippel LLP, hereby files this Objection to the Approval of the

Debtor's Disclosure Statement Relating to Debtor's Chapter 11 Plan dated March 28, 2018 (the

"Disclosure Statement") [D.I. 766], and to the Debtor's Motion for Entry of an Order Approving

(I) Disclosure Statement; (II) Procedures for the Solicitation and Tabulation of Votes to Accept

or Reject the Debtor's Chapter 11 Plan; and (III) Related Notice and Objection Procedures [D.I.

767] (the "Disclosure Statement Motion"), and in opposition to the relief requested by the

Debtor, the Committee states as follows:

I.      **SUMMARY OF OBJECTION**

1.      The Committee objects to the approval of the Disclosure Statement because the

Disclosure Statement fails to provide "adequate information" as required by 11 U.S.C. § 1125(a)

and relates to a Plan that contains facial deficiencies that renders it patently unconfirmable.

2.      The Disclosure Statement fails to provide adequate information in that certain critical information is either omitted, inadequately disclosed, or disclosed in a misleading fashion. The Committee objects to the adequacy of the Disclosure Statement on the following grounds:

(a)      The Disclosure Statement fails to provide sufficient information regarding the proposed releases of estate claims against the Debtor's Directors and Officers, including, but not limited to, the nature and value of any such claims, the identity of the beneficiaries of these releases, whether any consideration is being provided by the individual Directors and Officers in exchange for such releases and whether the releases are necessary for the Debtor's reorganization;

(b)      The Disclosure Statement fails to adequately identify the existence and extent of any insurance coverage available for liability claims against the Debtor's Directors and Officers which would likely indemnify the Directors and Officers from claims against them;

(c)      The Disclosure Statement lacks the Plan Supplement and Debtor's statement that it will be submitted to the Court no later than 10 days prior to the Confirmation hearing deprives interested parties with timely and critical information necessary to evaluate the Plan and its implementation;

(d)      The Disclosure Statement fails to provide an adequate description of the nature of the "additional consideration" needed to be received by the Debtor for it to exercise its discretion to grant conditional releases to the City of Philadelphia (the "City") and Community Behavioral Health ("CBH");

(e)      The Disclosure Statement contains inadequate information regarding the Debtor's improper Exculpation provisions;

(f)    The Disclosure Statement fails to provide adequate information regarding the asserted priority claim of Independence Blue Cross LLC and its implications on the distributions to general unsecured claims and, most significantly, the viability of the Plan and the Debtor's ability to establish that the Plan is feasible and that Confirmation of the Plan is not likely to be followed by a liquidation or the need for further financial reorganization.  See 11 U.S.C. §1129(a)(11);

(g)    The Disclosure Statement fails to provide adequate information regarding the treatment of Class 5 Insider Claims;

(h)    The Disclosure Statement fails to provide adequate information regarding the sublease between the City and the Debtor;

(i)    The Disclosure Statement fails to provide adequate information regarding the Debtor's proposed retention of Avoidance Actions; and

(j)    The Disclosure Statement fails to provide adequate information regarding certain contingencies that potentially have significant impact on distributions to general unsecured claims and the viability of the Debtor's Plan including the Debtor's ability to obtain long term commitments from CBH which would assure cash flows and viability after November 2018.

3.    Further, in addition to a lack of adequate information, the Disclosure Statement should not be approved because the Plan it describes provides for impermissible releases of third parties that renders it unconfirmable as a matter of law.

4.    Without significant changes to the Disclosure Statement and Plan, the Disclosure Statement Motion should not be approved.

5.       However, should the Court approve the Disclosure Statement Motion and permit solicitation of the Plan, the Committee requests that the Debtor be directed to include in the solicitation packages an explanatory letter from the Committee setting forth its concerns regarding the Plan and whether the Committee supports the Plan or recommends rejection.

## II.      STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

### A.      General Case Background.

6.       On or about December 30, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"). The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

7.       On or about January 23, 2017, the Office of the United States Trustee appointed the Committee pursuant to Section 1102 of the Bankruptcy Code to represent unsecured creditors in this case, and on or about February 9, 2017, the Bankruptcy Court granted the Committee authority to retain Obermayer Rebmann Maxwell & Hippel LLP as counsel to the Committee.

8.       The Debtor has been financially distressed for more than twenty years. However, the Disclosure Statement seeks to portray the Debtor's financial struggles as more recent in origin, having being precipitated by the closure of St. Joseph's Hospital ("SJH") in early 2016 and "residuary liabilities associated with that operation and the declining reimbursement rate for its Medicaid patients." [See, Disclosure Statement, Art.  IV (B)].

9.       Following the closure of SJH, the behavioral health services provided by SJH were relocated to the 801 W. Girard campus of NPHS. The Debtor currently operates the Girard Medical Center ("GMC"), a 65-bed psychiatric hospital, and the Goldman Clinic, a drug and alcohol addiction treatment center. The closure of SJH and the relocation of the Debtor's

behavioral services to GMC resulted in a reduction of NPH's workforce from over 1,000 to fewer than 500.

10.      Prior to and during the course of this bankruptcy proceeding, the Debtor engaged in a series of sales of its real property and business assets. In March 2017, the Debtor received approval for the sale of the St. Joseph's Hospital property located at 1600-50 W. Girard Avenue (the "SJH Property") to MMP Hospital Partners, LLP for $8,117,000, with the net proceeds being paid to retire certain secured bond indebtedness of the Debtor. In June 2017, the Debtor filed a Motion for the Sale of Certain of the Debtor's Assets pursuant to 11 U.S.C. § 363 (the "Asset Sale").

11.      The Asset Sale contemplated offering the subject assets in three lots: the first consisting of the parking lot located at 1300-42 N. 8th Street, Philadelphia, PA and the Debtor's operating assets, including the real estate and improvements located at 801 Girard Avenue ("Lot 1"); the second consisting of four related parcels of land generally referred to as the Debtor's Lower Parking Lot ("Lot 2"); and the third consisting of all the combined assets of Lots 1 and 2.

12.      Following an auction held in August 2017 (the "Auction"), the Debtor, after consultation with the Committee, determined that the highest and best bid for Lot 1 was made by IS3 West Girard, LLC ("IS3") in the amount of $8,500,000 in cash with a closing to occur on or before September 30, 2017.

13.      In addition to the cash consideration to be paid by IS3, certain concessions were made by the secured creditors, including the waiver of claims and asserted liens of the City, CBH and The Commonwealth of Pennsylvania (the "Commonwealth").

14.      Also following the Auction, the Debtor determined that the highest and best bid for Lot 2 was made by Project HOME in the amount of $1,750,000.  In addition to the cash

consideration to be paid, Project HOME agreed to waive any and all rejection damages claims it may have had against the Debtor's estate. The sale to Project HOME closed in September 2017, and the sale proceeds were used to pay certain secured and priority debt.

15.     The Sale Order for the IS3 transaction originally contemplated that upon closing, the City would enter into a one-year lease for the GMC facility and that NHS Human Services, Inc. ("NHS"), an entity not affiliated with NPHS, would enter into a sublease with the City and operate the various behavioral health and addiction programs at GMC.

16.     However, on the eve of closing the IS3 transaction, the City and CBH determined NHS would not be the operator of the GMC facility.

17.     In November 2017, NPHS was contacted by CBH about remaining as the operator of the programs at GMC following the closing of the IS3 sale, with the express understanding that CBH would backstop all operational losses without asserting additional administrative claims against the Debtor's estate. Additionally, CBH was to provide funding to the Debtor on an ongoing basis sufficient for NPHS to meet its direct and overhead costs and cash flows for operating the programs, including the costs associated with the sublease between the City and NPHS.

18.     To better reflect the changes to the transaction, the Debtor entered into an amended asset purchase agreement with IS3 (the "Amended APA"). The changes contained in the Amended APA involved post-closing employment; responsibility for employee PTO; cure amounts for assumed contracts; elimination of certain representations and warranties; reduction of holdback amounts; and the continuation of NPHS serving as operator of the GMC programs under a sublease with the City.

19.     On November 29, 2017, the Bankruptcy Court entered an order approving the

Amended APA which, as a result of protracted negotiations among NPHS, the Committee, CBH

and the City, included the following additional considerations: the net proceeds of the IS3 sale of

approximately $2 million after closing and administrative expenses and the payoff of the

Debtor's DIP financing facility with Gemino Healthcare Finance Receivables and outstanding

bonds with the Bank of New York Mellon ("BNYM") would be set aside for payment of

obligations in connection with the Plan; the Debtor committed to provide a provision in the Plan

for a lien on accounts receivable of up to $2.5 million in favor of unsecured creditors that would

be monetized and disbursed to unsecured creditors on terms to be agreed upon and included Iin

the Plan; the City and CBH agreed to waive any claims that the backstopping of Debtor's

operations entitled them to an administrative claim; and an agreement by NPHS to pay at closing

certain outstanding claims for legal costs by HUD Group and BNYM.

20.     The sale to IS3 closed on November 30, 2017.  With the continuation of NPHS as

operator of the programs of the GMC facility, the complexion of the case changed from a

liquidation to a reorganization.

**B.      The Disclosure Statement and Plan.**

21.     On March 28, 2018, the Debtor filed the Plan of Reorganization of North

Philadelphia Health System Under Chapter 11 of the Bankruptcy Code (the "Plan") [D.I. 765],

which fails to meet the confirmation requirements of the Bankruptcy Code and does not have the

support of the Committee, along with the Disclosure Statement, which is wholly inadequate in

several material respects and should not be approved by the Court. On the same day, the Debtor

filed the Disclosure Statement Motion seeking approval of the Disclosure Statement as well as

the solicitation and tabulation of votes to accept or reject the Debtor's Chapter 11 Plan and

related notice and objection procedures.

22.     The Plan contemplates the formation of a liquidating trust (the "Liquidating

Trust") into which the remaining assets of the Debtor (consisting primarily of cash proceeds

from the Debtor's sales of assets, claims and certain limited causes of action) will be transferred.

However, the Debtor is excluding from the transfer to the Liquidating Trust valuable causes of

action based on Avoidance Actions, D&O claims, actions against the City and CBH, and account

receivable claims.

23.     Further, the Debtor continues to operate, yet offers unsecured creditors nothing

from its significant cash flows to creditors.  The Debtor and CBH both agreed to negotiate a Plan

in good faith; however, as the Committee understands, the Debtor and CBH have failed to agree

on a final budget that would allow the Debtor to finally, after decades of losses, return to

profitability and provide unsecured creditors meaningful distribution; the *sine qua non* of a

successful reorganization

**C.     The Debtor Proposes Improper Plan Releases of its Directors and Officers.**

24.     The Disclosure Statement describes certain release provisions contained in the

Plan. Specifically, the Disclosure Statement states that:

> **The Plan also provides for a release by the Debtor on behalf of itself and its Bankruptcy estate, of its directors and officers from any claims, except those resulting from gross negligence or willful misconduct. Notwithstanding the foregoing, the directors and officers will not be released of any obligation arising under or in connection with the asset purchase agreements underlying the various sales of assets.**

[Disclosure Statement, Art. V (B) (3)] (original in bold).[1]

---

[1] The Plan, in Art. XII Section 12.04 (Release by the Debtor) provides:

25.    The Disclosure Statement fails to provide an adequate factual foundation of the Debtor's proposed releases of estate claims against its Directors and Officers (the "D&O Releases") and the necessity, nature and impact of such releases upon interested parties such as unsecured creditors.

26.    The Committee believes that there exist significant and viable claims against the Debtor's D&Os, including potential claims for breach of fiduciary duties and for deepening insolvency. These potential D&O claims may have significant value for the estate, may be the subject of insurance coverage, and should be preserved as potential claims for the benefit of the Debtor's general unsecured creditors.  The Committee avers that there may be as much as $10,000,000.00 in insurance coverage for these claims.

27.    During the course of its investigation of these D&O claims, the Committee has reviewed documents and business records produced by the Debtor and conducted a Rule 2004 Examination of George J. Walmsley III, the former President and Chief Executive Officer of NPHS.

---

**(a)    Release of Directors and Officers.    The Debtor, on behalf of itself, and the Estate hereby fully releases, remises, acquits, waives and forever discharges the D&Os of NPHS, (collectively, the "D&O Released Parties"), from any and all claims including, among other things: liabilities, losses, claims, demands, accounts, debts, dues, sums of money, claims for professionals' (including but not limited to attorneys) fees or costs, claims arising under the Bankruptcy Code, (including but not limited to actions under 11 U.S.S. §§ 547 and 548), state law fraudulent conveyance claims, reckoning, costs, bonds, bills, expenses, rights of recoupment, indemnification, contribution, obligations, covenants, controversies, agreements, promises, variances, torts, omissions, representations, breaches of contract, breaches of obligations to perform, actions, causes of action, suits, damages (whether actual, compensatory, punitive, or exemplary), judgments, executions, counterclaims, or setoffs that the Debtor ever had or may now have against the D&O Released Parties of any nature whatsoever, whether presently existing or which may hereafter arise, whether in law or in equity, whether sounding in contract, tort or any other basis, whether matured or unmatured, whether liquidated or unliquidated, whether contingent or not contingent, and whether known or unknown, and having arisen in whole or in part from the beginning of time through the Effective Date, except those resulting from gross negligence or willful misconduct (the foregoing are the "D&O Released Claims"). Notwithstanding the foregoing, no D&O released party shall be released from any obligations arising under any Employment Agreement or settlement agreement that the D&O Released Party has with the Debtor. (Original in bold)**

28.     The Committee's investigation revealed that the Debtor's management was unprepared to deal with the financial impact of the closing of SJH, and permitted the Debtor's insolvency to deepen, and that the D&Os breached their duties to creditors by exalting the mission over the interests of unsecured creditors. The Debtor's counsel sat in on the examination of the Debtor's CEO, George J. Walmsley III, and has been told on numerous occasions that if the Debtor refused to pursue claims against the D&Os for, among other things, breaches of fiduciary duty and deepening insolvency, that the Committee intended to pursue such claims derivatively for the benefit of the estate.

29.     The creditors of NPHS have derivative standing to assert claims for any breaches by the D&Os of fiduciary duties and deepening insolvency. The Committee believes that value to the estate may be realized for the benefit of its unsecured creditors. The Debtor's proposed releases of D&O claims, for little or no consideration, would deprive the estate and its unsecured creditors of the value of these claims.

30.     When a nonprofit company is solvent, the duty of a director is generally owed solely to the corporation and may be enforced directly by the corporation. 15 Pa.C.S.A. § 5717. However, when a company becomes insolvent, the fiduciary duties owed by corporate officers and directors shifts to the company's creditors. See, In re Bruno, 553 B.R. 280, 286 (Bankr. W.D. Pa. 2016), citing, In re Lemington, 659 F.3d 282, 290 (3d Cir. 2011).  However, "an action to redress injuries to the corporation cannot be maintained by an individual shareholder, but must be brought as a derivative action in the name of the corporation." Id. (citations omitted) (describing Pennsylvania law). See, Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 348 (3d Cir. 2001). Creditors of insolvent corporations have standing to maintain derivative claims against directors on behalf of corporation for breaches of fiduciary

duties. <u>North American Catholic Educational Programming Foundation, Inc. v. Gheewalla</u>, 930 A.2d 92, 102-03 (Del. Supr. 2007)(applying Delaware corporate law).

31.     However, contrary to the evidence of potential D&O claims brought to the Debtor's attention by the Committee, the Debtor in the Disclosure Statement asserts that it sees no evidence of "self-dealing, willful misconduct or recklessness"[2] and that under the standard of proof applicable to boards of directors for Pennsylvania non-profit corporations it concludes that the likelihood of success of any D&O claim was "extremely low." In a strained attempt to justify the release of these potentially valuable D&O causes of action, the Debtor speculates that a made D&O claim would compromise its future ability to obtain insurance at affordable rates. [Disclosure Statement, Art. V (B) (9) (ii)]. The claims against the Debtor's D&O's should remain in trust with the Debtor's estate while the Committee completes its investigation to determine what action, if any, should be taken with respect to the potential claims against the D&Os.

**III.    <u>OBJECTION</u>**

   **A.    The Disclosure Statement Cannot Be Approved Because It Does Not Contain Adequate Information as Required by Section 1125 of the Bankruptcy Code.**

32.     Section 1125(b) of the Bankruptcy Code mandates the filing of a disclosure statement containing "adequate information." 11 U.S.C. § 1125(b). Section 1125(a) defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor … that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an

---

[2] 15 Pa.C.S.A. § 5712 (Standard of Care and Justifiable Reliance) provides that a director of a non-profit corporation stands in a fiduciary relation to the corporation and shall perform his duties in "good faith," "in the best interests of the corporation" and "with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." 15 Pa.C.S.A. § 5713 (Personal liability of directors) states if a bylaw of the non-profit corporation provides, a director may not be personable liable except for a breach of duties or failure to perform that constitutes "self-dealing, willful misconduct or recklessness."

informed judgment about the plan…" 11 U.S.C. § 1125(a). Whether a disclosure statement

includes "adequate information" is determined on a case-by-case basis. Oneida Motor Freight,

Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988). As the Third Circuit has

recognized, the debtor's obligation to provide sufficient data to satisfy the Section 1125 standard

of adequate information "cannot [be] overemphasiz[ed]," as "the importance of full disclosure is

underlaid by the reliance placed upon the disclosure statement by the creditors and the court." Id.

The Disclosure Statement here fails to provide adequate information for creditors to evaluate and

vote on the Plan. Significant modifications will be necessary to comply with Section 1125 of the

Bankruptcy Code. Until such modifications are made, the Court should decline to permit

solicitation of the Plan.

  33. Whether a disclosure statement contains "adequate information" should be

assessed from the perspective of the claims or interest holders with the ability to vote. See, In re

Phoenix Petroleum Co., 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (citing, In re Monroe Well

Serv., Inc., 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987)). See also, 11 Collier on Bankruptcy,

1125.03[1] (15th rev. ed. 2009) (courts should "consider the needs of the claims or interest of the

class as a whole and not the needs of the most sophisticated or least sophisticated members of a

particular class").

  34. An adequate disclosure statement must provide some degree of corroborating

factual information to encourage intelligent and "enlightened" voting. In re Ferretti, 128 B.R. 16,

19 (Bankr. D.N.H. 1991)(disclosure statement must contain simple and clear language

delineating the consequences of the . . . plan so that the [parties] can intelligently accept or reject

the Plan); In re BSL Operating Corp., 57 B.R. 945, 950 (Bankr. S.D.N.Y. 1986)("[D]isclosure

statement . . . is evaluated in terms of whether it provides sufficient information to permit

enlightened voting by holders of claims or interests.").

35.    In its current form, the Disclosure Statement lacks critical information necessary

to understand the consequences of the Plan and to "permit enlightened voting" by holders of

general unsecured claims. The Disclosure Statement suffers from the following material

informational deficiencies.

### 1.    The Disclosure Statement fails to provide an adequate factual foundation that would justify the broad D&O Releases.

36.    The Disclosure Statement lacks adequate information to justify the broad D&O

Releases provided for in the Plan. The Plan currently provides Debtor releases to the Debtor's

D&Os for all estate claims, except those resulting from gross negligence, willful misconduct or

any obligations arising under or in connection with any obligations arising under any

Employment Agreement or settlement that the D&O Released party has with the Debtor. The

Disclosure Statement falls well short of providing adequate information to explain and justify

these extremely broad releases and injunctions in favor of the D&Os, and should not be approved

on this basis alone.

37.    Rather than providing creditors with sufficient information to form even a

rudimentary understanding of the nature and consequences of these non-debtor releases, the

Disclosure Statement merely states that Committee has raised concerns of the existence of

potential causes of action against the D&Os on theories of deepening insolvency and describes

the underlying basis for these claims as the failure to take immediate steps close GMC when it

was ordered by the Commonwealth in March 2016 to close SJH, delaying the ultimate decision

to file for Chapter 11 relief for an additional nine months. [Disclosure Statement, Art. V (B) (9)

(ii)].

38.    The Debtor's characterization mischaracterizes and minimizes the potential claims against the D&Os that the Committee has brought to the attention of the Debtor.

39.    The Debtor, instead, offers in the Disclosure Statement nothing more than its factually-uncorroborated position that "[b]ased on its review of the documents, the Walmsley testimony, and its own analysis, [that] NPHS determined that the likelihood of success of any claim against the Directors and Officers is extremely low." [Disclosure Statement, Art. V (B) (9) (ii).] While the Debtor claims that the D&O Releases are an exercise of its business judgment, it cites as justification only an unsubstantiated concern about the potential for increased insurance rates in the event that an insurance claim was made. Id. This does not constitute adequate information under Section 1125(a) of the Bankruptcy Code. In re Lower Bucks Hosp., 571 Fed.Appx. 139, 144 (3d Cir. 2014) (affirming rejection of third party releases that were not adequately disclosed in debtor's disclosure statement).

40.    The Debtor must include in its Disclosure Statement sufficient information regarding claims and causes of action proposed to be released under the Plan for creditors to evaluate the prudence of those releases. Despite the broad releases proposed, the Disclosure Statement contains insufficient information regarding the nature of those claims and their potential value to the Debtor's estate and the consequences that the D&O Releases would impose upon unsecured creditors. Creditors cannot make an informed decision on whether to accept a plan that includes broad insider releases without knowing the full nature and potential valuation of those claims.

41.    Courts must scrutinize plans of reorganization that purport to release claims against non-debtors. The Bankruptcy Code prohibits the release and permanent injunction of claims against non-debtors under most circumstances. See 11 U.S.C. § 524(e) ("Except as

provided in subsection (a)(3) . . . discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."). Notwithstanding the language of Section 524, a plan of reorganization "may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). A debtor may release claims in a plan pursuant to § 1123(b)(3)(A) only where the release is a valid exercise of the debtor's business judgment and is fair, reasonable, and in the best interest of the estate. In re Spansion, 426 B.R. 114, 143 (Bankr. D. Del. 2010)(citations omitted). The scope of a release under Section 1123(b)(3) generally is limited as it generally requires some showing that tangible potential claims are being settled rather than merely an attempt at a backdoor non-debtor release.

42.    "Where a compromise is part of a plan of reorganization, however, the court has the duty to determine that a proposed compromise forming part of a reorganization plan is fair and equitable." In re Coram Healthcare Corp., 315 B.R. 321, 334 (Bankr. D. Del. 2004). "Where releases are granted to non-debtors under a plan of reorganization, additional factors are often relevant to determine the fairness of the compromise." Id. (citing, Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 212-14 (3d. Cir. 2000); In re Genesis Health Ventures, Inc., 266 B.R. 591, 608 (Bankr. D. Del. 2001); In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999)); see also, In re Washington Mut., Inc., 442 B.R. 314, 352 (Bankr. D. Del. 2011) ("Determining the fairness of a plan which includes the releases of non-debtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case.")

43.    When evaluating the appropriateness of proposed releases of the debtor's claims

against non-debtors[3], courts in the Third Circuit generally consider the following five factors to

determine whether the equities weigh in favor of approval:

> (1) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;
>
> (2) a substantial contribution to the plan by the non-debtor;
>
> (3) the necessity of the release to the reorganization;
>
> (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and
>
> (5) the payment of all or substantially all of the creditors and interest holders under the plan.

See, Zenith Electronics Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing, In re Master

Mortgage Inv. Fund, Inc., 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)); see also, In re

Washington Mut., 442 B.R. at 346 (applying same standard); In re Indianapolis Downs, LLC.,

486 B.R. 286, 303 (Bankr. D. Del. 2013) (applying same standard). These factors are neither

exclusive nor are they a list of conjunctive requirements. Master Mortgage, 168 B.R. at 935.

Instead, they are helpful in weighing the equities of the particular case after a fact-specific

review. Id.

44.    Aside from the Debtor's bald conclusions and minimizing characterization of the

claims against the D&Os, the Disclosure Statement provides no information of substance that

would provide a creditor with an understanding about the nature and scope of the proposed D&O

Releases and whether they are fair and reasonable. Furthermore, there is no factually-

corroborated information in the Disclosure Statement that would suggest that the D&O Releases

---

[3] In addition to releases of debtor claims against non-debtors, some plans contain releases of claims between non-debtor entities, commonly known as third-party releases. To date, it is unresolved in the Third Circuit whether non-consensual releases of non-debtor claims against other non-debtors are permissible. See, In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000). A discussion of the D&O Releases in the context of third-party releases will follow.

are justified under the facts of this case, necessary for the reorganization, or in the best interest of the estate and its creditors.

45.      In fact, the Disclosure Statement does not advance any information that would indicate that any of the <u>Zenith</u> factors are present here that would support a finding that the D&O Releases are sustainable under applicable law.

(a)      The identity of interest factor is not found here. The composition of the board of directors has changed. George J. Walmsley III, the President and Chief Executive Officer of NPHS has resigned from NPHS. NPHS is believed to have D&O insurance policies in place. Thus, while NPHS is continuing business under reconstituted management and board of directors, an avoidance or fiduciary breach action would not drain assets from the estate or distract management's focus from a successful emergence from bankruptcy. Such claims would be brought derivatively by the Committee and the Debtor would be nothing but a nominal party to the action and the level of management involvement would be minimal.

(b)      The D&Os are not providing any consideration to the estate — let alone "substantial consideration" — in exchange for the gratuitous D&O Releases. The form of contribution may be financial or may be in the form of participation in a global settlement that allows the reorganization to move forward. An analysis of "substantial contribution" is necessarily fact-specific. For example, in <u>Zenith</u>, the court found that the officers and directors provided a substantial contribution to the reorganization "by designing and implementing the operational restructuring and negotiating the financial restructuring." <u>Zenith</u>, 241 B.R. at 111. In contrast, the court in <u>Genesis Health</u> concluded that even where "the officers and directors of the debtors no doubt made meaningful contribution to the reorganization by designing and implementing the operational restructuring of the companies, and negotiating the financial

restructuring with parties in interest," there had been "no showing" of substantial contribution

because the officers and directors had "been otherwise compensated for their contributions, and

the management functions they performed do not constitute contributions of 'assets' to the

reorganization." Genesis Health, 266 B.R. at 606-07. Additionally, substantial contribution was

found in In re Coram Healthcare Corp. where the released non-debtor contributed $56 million to

the Plan funding, 315 B.R. 321, 335 (Bankr. D. Del. 2004), and also in Washington Mutual,

where the released non-debtors "made a substantial contribution to the Plan by waiving claims

they had asserted against numerous assets of the Debtors ... and by waiving the proofs of claim

they have filed which the Debtors have estimated to be in excess of $54 billion." 442 B.R. at

347. The Washington Mutual Court reasoned that: "[t]hese waivers are not simply significant in

total dollars but also in comparison to the total claims against the estate; they are clearly the

largest claims. Further, the claims being waived do not simply reduce the claims against the

Debtors' estate; they permit the use of property of the estate free of competing claims to

ownership." Id. Here, the Debtor provides no factual foundation that the D&Os are providing any

consideration whatsoever in exchange for the releases.

(c)     The D&O Releases are not necessary for the Debtor's reorganization.

While debtor releases are sometimes approved when found to be essential to a reorganization

that enables debtor to emerge from bankruptcy to the benefit of its creditors, such is not the case

here. To the contrary, there is no suggestion in the Disclosure Statement that the D&O Releases

are necessary for the Debtor's reorganization. The Debtor states a desire for continued

inexpensive insurance rates as the underpinning of its supposed business judgment to grant the

D&O Releases. However, there is no credible argument that the success of the Debtor's

reorganization will rest on insurance rates.

(d)      While voting has not yet taken place with respect to the Plan, given the potentially low distributions projected for general unsecured creditors, it is unlikely that the Plan will receive the "overwhelming acceptance" and support from affected constituencies necessary for the approval of any non-debtor releases. Furthermore, the support of the creditor's committee is a key consideration for the approval of the debtor's release since that entity has the greatest incentive to limit the scope or prevent the release to preserve any potential claims. In re Abeinsa Holding, Inc., 562 B.R. 265, 285 (Bankr. D. Del. 2016).

(e)      The D&Os are not providing any financial contribution in exchange for the proposed D&O Releases and it is not anticipated that there will be a substantial distribution to general unsecured creditors under the Plan as currently formulated.

46.      The D&O Releases are substantially similar to the debtors' proposed releases in the Washington Mutual case, where the debtors sought to release their "current and former officers [and] directors." Washington Mut., Inc., 442 B.R. at 349. Applying the five-factor Zenith test, the Delaware Bankruptcy Court found that although an identity of interest existed between the debtors and their former officers and directors, that fact "alone is insufficient to justify the releases." Id. Turning to the remaining Zenith factors, the Court concluded there was "simply no basis" for the releases because the debtors could present no evidence to show (i) a "substantial contribution" made to the case by the former directors and officers or (ii) that such releases were necessary for the reorganization. Id. at 350.

47.      Thus, the Disclosure Statement fails to provide any information to creditors that the proposed D&O Releases are fair, reasonable and sustainable under applicable law and the Disclosure Statement Motion should therefore be denied.

48.     Further, the Disclosure Statement fails to meet the requirements for plan

injunctions under Fed. R. Bankr. P. 3016. If a plan provides for an injunction, the plan and

disclosure statement "shall describe in specific language. . . all acts to be enjoined and identify

the entities that would be subject to the injunction." Fed. R. Bankr. P. 3016(c).[4] While the

Disclosure Statement makes reference in Art. V (B) (2) to the Plan D&O Release using bold

typeface, it is completely silent as to the nature of the claims subject to the release and that

derivative claims possessed by creditors for breach of fiduciary duties may be subject to a

release.

### 2.     The Disclosure Statement fails to describe available insurance coverage.

49.     Other than a vague reference to a need for continued access to inexpensive

insurance premiums as justification for the D&O Releases, the Disclosure Statement fails to

describe any available directors' and officers' liability insurance policies (the "D&O Policies")

which may provide coverage for any liabilities of the Debtor's current and former D&Os,

including potential claims for breaches of fiduciary duties. The Disclosure Statement fails to

disclose the extent of these D&O Policies and which parties may have access to the proceeds

thereof.

### 3.     The Disclosure Statement fails to provide an adequate factual foundation that would justify the improper and conditional Plan Releases of the City and CBH.

50.     The Disclosure Statement lacks adequate information to justify the broad and

conditional releases by the Debtor to City and CBH for all claims, except those arising from

gross negligence or willful misconduct, or any claims arising in connection with any of the asset

---

[4] "Injunction under a plan. If a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." Fed. R. Bankr. P. 3016(c).

purchase agreements, the IS3 lease and sublease, provider agreements, the Plan, contracts

between the City and CBH, and any account receivables or contract payments due NPHS (the

"CBH/City Releases"). [Disclosure Statement, Art. V (B) (3) (ii)].[5]

51.     The proposed CBH/City Releases suffer the same deficient factual foundation as

the D&O Releases discussed above, including, but not limited to a lack of identity of interest,

substantial consideration to the estate and necessity to the reorganization.

52.     The Disclosure Statement acknowledges potential causes of action against CBH

for the failure to make rate increases and that the Committee has alleged claims against CBH for

NPHS's insolvency and decisions regarding the timing of the bankruptcy filing. [Disclosure

Statement, Art. V (B) (9) (iii)]. However, the Debtor's discussion of the CBH/City Releases

stops there and there is no other information provided that would support the inclusions of these

non-debtor and third-party releases for the City and CBH.

---

[5] The Plan, in Art. XII Section 12.04 (Release by the Debtor) provides:

**(b)      Release of City and CBH.  Conditioned on receipt by the Debtor of sufficient additional financial, post-Effective Date consideration, the occurrence of the Effective Date shall constitute a release between the Debtor, on behalf of itself and the Estate, on the one hand, and the City and CBH (collectively, the "The City and CBH Released Parties"), on the other from any and all claims including, among other things: liabilities, losses, claims, demands, accounts, debts, dues, sums of money, claims for professionals' (including but not limited to attorneys) fees or costs, claims arising under the Bankruptcy Code, (including but not limited to actions under 11 U.S.C. §§ 547 and 548), state law fraudulent conveyance claims, reckoning, costs, bonds, bills expenses, rights of recoupment, obligations, covenants, controversies, agreements, promises, variances, torts, omissions, representations, breaches of contract, breaches of obligations to perform, actions, causes of actions, suits, damages (whether actual, compensatory, punitive, or exemplary), judgments, executions, counterclaims, or setoffs that each party has or may have had against the other  or any nature whatsoever, whether presently existing or which may hereafter arise, whether in law or in equity, whether sounding in contract, tort or any other basis, whether matured or unmatured, whether liquidated or unliquidated, whether contingent or not contingent, and whether known or unknown, and having arisen in whole or in part from the beginning of time through the Effective Date, except those resulting from gross negligence or willful misconduct.  Notwithstanding the foregoing, no City and CBH Released Party shall be released from any undertakings arising in connection with any of the asset purchase agreements; the lease and sublease arrangement among I53, the City, and NPHS; and accounts receivable or contract payment due NPHS; or any contracts between the Debtor and the City or CBH including contracts to provide services.  The sufficiency of the additional consideration provided by the CBH Released Parties shall be determined by the Debtor in its complete discretion.**

53.    The Disclosure Statement makes reference to provisions in the Plan for CBH/City Releases, which would become effective upon the Effective Date, that are "[c]onditioned on the receipt by the Debtor of sufficient additional, post-Effective Date consideration" and that "[t]he sufficiency of the additional consideration by the CBH Released Parties [sic] shall be determined by the Debtor in its complete discretion." [Plan, Art. XII Section 12.04 (Release by the Debtor) (original in bold)].

54.    The Disclosure Statement provides no further information on the nature and amount of this "additional financial, post-Effective Date consideration," if the consideration would be in the form of cash payments, provider agreement extensions, increased rates, etc., whether the additional consideration will inure to the benefit of the estate's creditors, why the proposed release will be granted upon the occurrence of the Effective Date and prior to any receipt of the consideration, and how the Debtor will exercise its "complete discretion" in determining the "sufficiency of the additional consideration." The Committee believes the claims against CBH – the Debtor's single source payor and prepetition lender – are significant. To simply leave this claim "out there" without a description of how these additional concessions will be determined or a mechanism to show how the release creates value is not an adequate disclosure.

> **4.    The Disclosure Statement fails to provide an adequate factual foundation that would justify the Plan Exculpations.**

55.    The Disclosure Statement makes reference, without further elaboration, that the Plan provides for "exculpation provisions regarding the Debtor, its officers, directors, employees, advisors, attorneys, professionals, or agents. . .for conduct acts and omissions in connection with or related to the Chapter 11 case." [Disclosure Statement, Art. V (B) (3); Plan, Art. XII, Section 12.02, Exculpation].

56.    The Committee asserts that viable claims exist against the Debtor and its officers,

directors and employees for wrongful conduct both before and during the Chapter 11 cases that

reduced the amount of assets available for distribution.

57.    The Disclosure Statement provides a voting creditor with no information

regarding claims that would be released as a result of the exculpation provisions in the Plan.

**5.    The Disclosure Statement fails to provide adequate information regarding the status of the priority claim of Independence Blue Cross LLC and its implications for distributions to general unsecured claimants.**

58.    The Disclosure Statement notes that Independence Blue Cross, LLC ("Blue

Cross"), the healthcare insurer for the Debtor's employees, filed a proof of claim (Claim 45-1)

asserting a priority under 11 U.S.C. § 507(a)(5) for purported contributions to an employee

benefit plan in the amount of $10,445,548.98 (the "Blue Cross Claim").

59.    The Disclosure Statement reveals that "NPHS is investigating the extent, validity

and priority of this claim and cautions that, if allowed in full as a priority claim, there will likely

be no recovery for Class 3 [General Unsecured] Claimants and only a de minimus return to all

other Class 2 priority claims."  [Disclosure Statement, Art. V (A) (3)]. The Disclosure Statement

suggests that the Debtor is engaged in negotiations with Blue Cross to consensually reduce the

priority claim but if those efforts are unsuccessful and Blue Cross prevails in its position that it is

entitled to priority status for most, if not all, of its claim, then all priority claimants will receive a

pro rata portion of available funds, estimated to be less than three cents on the dollar, and "it is

extremely likely that general unsecured creditors will receive nothing." Id.

60.    Additionally, the Disclosure Statement ties the Post-Effective Date contribution and commitment of NPHS to supplement the Plan[6] as being contingent on reaching an agreement, acceptable to the Debtor, with Blue Cross that allows for a "meaningful return to Class 3 Claimants" but that if no such agreement is reached that the Debtor nevertheless intends to proceed to confirmation without a commitment to provide post-Effective Date enhancements to the Liquidating Trustee. [Disclosure Statement, Art. IX].

61.    A priority claim under 11 U.S.C. § 507(a)(5) is limited to "contributions to an employee benefit plan arising from services rendered within 180 days before the date of the filing of the petition" with the maximum dollar amount of the priority claim being equal to the number of employees covered by such plan multiplied by $12,850, less the sum of (i) the aggregate amount paid to such employees under section 507(a)(4) and (ii) the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan. 11 U.S.C. § 507(a)(5).

62.    Much is unknown about the Blue Cross Claim and the status of the purported negotiations for a consensual resolution regarding the extent that it will be allowed as a priority. The Blue Cross Claim consists of only three pages, lacks supporting documentation, and states only that the claim is based on unpaid health insurance premiums in the amount of $10,445,548.98.  There is no indication of the extent to which the claim is based on services performed by the Debtor's employees within 180 days before the Petition Date or the extent to which the priority claim allowance may be subject to the statutory monetary cap.

---

[6] According to the Disclosure Statement, if Blue Cross consents to a compromise acceptable to the Debtor, the Debtor will supplement the Liquidating Trust with the proceeds of any causes of action brought by the Liquidating Trustee; annual payments of $50,000 for five (5) years supplied from NPHS charitable trusts income; a portion of the 30 Day Cash; and the commitment of NPHS to pay the obligations associated with the Accounts Receivable Lien before the sixth (6th) anniversary of the Effective Date. [Disclosure Statement, Art. V (B) (2)].

63.    More significantly, there is a large question as to whether Blue Cross, as a third-party group health insurer, is itself even eligible to make a claim under 11 U.S.C. § 507(a)(5). There appears to be a split in case law regarding the eligibility of group policy insurers to make priority claims under § 507(a)(5) for a debtor's failure to make premium payments. See, In re AER-Aeron, Inc., 182 B.R. 725 (Bankr. E.D.N.C. 1995)(insurance company not entitled to benefits priority); Edward W. Minte Co. v. Franey & Parr (In re Edward W. Minte Co., Inc.), 286 B.R. 1, 7-8 (Bankr. D. D.C. 2002)(same); But see, In re Tropicana Entertainment, LLC, et al., No. 08-10856(KJC), slip op. at 9-10 (Bankr. D. Del., Oct. 14, 2015)(provider of insured health program granted priority status under § 507(a)(5)).

64.    Given the enormous implications to general unsecured creditors, the extent to which the Blue Cross Claim is allowed as a priority must be resolved prior to confirmation so that holders of unsecured claims have a meaningful understanding of their treatment under the Plan as they cast a ballot.

65.    Moreover, the existence of the Blue Cross priority dispute creates significant feasibility issues for the Debtor, since the Debtor is financially incapable of assuming the Blue Cross group healthcare insurance agreements under §365 of the Bankruptcy Code.  Query, then, how the Debtor will obtain insurance in June 2018 when the existing Blue Cross contract expires and, without health insurance, the Debtor's operations will fail.

### 6.    The Disclosure Statement fails to provide adequate information regarding the treatment of Class 5 Insider Claims.

66.    The Disclosure Statement describes the special treatment afforded to two of the Debtor's former highly-compensated executives. Carved out from the treatment of Class 2 (Priority) and 3 (General Unsecured) claims, the Plan creates a new Class 5 of Insider Claims consisting of the claims held by George J. Walmsley, III (former President and Chief Executive

Officer) and Margaret A. Boemmel ("Boemmel") (former Senior V.P. and CFO). Walmsley and

Boemmel purportedly filed claims in the respective amounts of $1,822,567.51 and $608,422.63

arising from their employment agreements with NPHS, of which "a portion of each claim"

asserted an entitlement to priority treatment. [Disclosure Statement, Art. V (A) (6)].

67.    The Disclosure Statement fails to disclose either the basis for or amount of each

claim asserted to be entitled to priority.

68.    The Disclosure Statement references the Debtor's post-petition settlements with

Walmsley and Boemmel regarding their respective resignations with NPHS, through which they

received payment of accrued but unpaid time off and continued being employed for three and

two months, respectively, at monthly salaries of $10,000 and $15,000.

69.    The Disclosure Statement indicates that "[u]nder the Plan, NPHS is also resolving

the severance claims made by these individuals and will be exchanging a mutual release of

claims. The individuals will each be receiving a $50,000 administrative claim. . . ." Id.

70.    The Disclosure Statement fails to provide adequate information of the justification

for the special treatment of the Debtor's insiders, whether the all of the claims of Walmsley and

Boemmel are being satisfied through the payment to each of an $50,000 administrative claim, the

basis for such proposed priority administrative claim, as well as the possibility that Walmsley

and Boemmel would receive a greater percentage distribution than Class 2 priority claimants.

**7.    The Disclosure Statement fails to provide adequate information
regarding the terms of the sublease between the Debtor and the City
for the GMC facility.**

71.    Rather than liquidating as previously contemplated, NPHS intends to continue its

business by operating the various behavioral health programs at GMC under a sublease with the

City.

72.    The Disclosure Statement indicates that NPHS is currently the subtenant of the GMC facility from the City as a part of the IS3 transaction at the rental rate of $1.00 for the initial year terminating November 30, 2018, plus the pass through of certain expenses. [Disclosure Statement, Art. V (B) (1)].

73.    However and ominously, the Disclosure Statement reflects that in the second year of the sublease, the rental rate for the property will "increase substantially" and to "minimize the impact of the year 2 costs" the parties to the sublease arrangement are exploring alternatives such as "bringing additional tenants into the property and reducing the amount of space occupied by NPHS." Id.

74.    The threat to continued business viability posed by the current terms of the sublease is so real that the Disclosure Statement acknowledges, under the heading "Risk Factors," that unless NPHS is able to reduce expenses or sufficiently increase its revenues, "NPHS may not be able to afford a lease or sublease for a second year as tenant at the 801 W. Girard property" and that if NPHS is unable to continue operations, supplemental plan funding associated with the charitable trust income will cease and there may be issues collecting the Account Receivable Lien. [Disclosure Statement, Art. IX].

75.    True to form, the Debtor has entered into an agreement lacking the current ability to perform, hoping for a favorable change in circumstances. By its own admission, absent a substantial reduction in rent obligations or a significant increase in revenues, NPHS will be unable to afford the sublease after the first year, jeopardizing continued operations.

76.    Despite the dire consequences of the of the increase in rent in the second year of the sublease, the Disclosure Statement provides no information regarding the terms of the sublease, the amount of the increase in the second year, and whether the term of the sublease

continues beyond the second year. Further, the Disclosure Statement fails to assess the Debtor's ability to increase its revenues, which is unlikely since its business model relies on a single-payor source for its services that historically has been resistant to reimbursement rate increases.

> **8.    The Disclosure Statement fails to provide adequate information regarding the Debtor's retention of the Avoidance Actions.**

77.    The Disclosure Statement indicates that in addition to claims against the D&Os, claims against CBH and the City, and account receivable claims, the Debtor is also withholding from transfer to the Liquidating Trust all avoidance actions under Chapter 5 of the Bankruptcy Code. [Disclosure Statement, Art. V (B) (9) (i)]. The Debtor attaches as Exhibit B a schedule of potential preference claims listing 49 vendors with aggregate payments of over $3.3 million.

78.    Unsecured creditors should share equally in the recovery of any avoidance actions.

79.    The Debtor fails to provide justification for the withholding these avoidance actions other than stating that for business reasons it needs to control the determination whether to bring avoidance actions since it intends to maintain relationships with many of the vendors who received preference payments. The Disclosure Statement is unclear whether the Debtor will retain the proceeds of any such avoidance actions or if those proceeds will be transferred to the Liquidating Trust for distribution to unsecured creditors.

> **9.    The Disclosure Statement fails to provide adequate information regarding contingencies that may have significant impact on distributions and plan viability.**

80.    The Disclosure Statement indicates that the effectiveness of the Plan is contingent on certain recoveries being made – including over $1.1 million in debt service reserve funds still retained by BNYM. The Debtor states that while it anticipates receiving these funds in April 2018, if it does not, it may not have the means to fund the Plan. [Disclosure Statement, Art. VII

(A)]. Given the significance of these funds to the viability of the Plan, the Disclosure Statement fails to provide adequate information about the status of the withheld funds and the prospects for receipt.

81.     The Debtor's Plan is not feasible, and without significant additional moneys the Debtor will not be able to satisfy § 1129(a)(11) which requires the Debtor to establish that post confirmation the Debtor will not be facing liquidation or need further liquidation.

82.     First and foremost, the Debtor's sublease ends in less than six months.  Without a lease extension, the Debtor will liquidate.  Next, the Debtor is still operating at a loss without the CBH supplement, or "back stop," and CBH has neither agreed to increase rates, nor promised to renew the Debtor's Provider Agreements.  The Debtor makes no predictions of its ability to obtain an sublease extension or additional rate increases.

83.     Third, the Debtor must obtain a deal with Blue Cross <u>before</u> confirmation, since its inability to obtain or maintain health insurance will be fatal to its reorganization efforts.

84.     Fourth, the Plan as presented provides the likely potential of <u>little of no recovery to unsecured creditors while releasing insiders of potential claims for which there is believed to be $10,000,000.00 of insurance coverage.</u>

85.     <u>Finally, the Plan as written, is not one filed in good faith.  Where, as here, the Debtor's real efforts are to rid itself of $40 million of unsecured debt incurred while shielding management – which continually and systemically failed to see the obvious signs of failure in the Debtor's operations – from viable claims, there is little question as to the Debtor's lack of good faith.</u>

**10.     The Disclosure Statement lacks the Plan Supplement.**

86.     The Plan, but not the Disclosure Statement, makes reference to a Plan Supplement

supporting the Plan that will be filed no later than ten days prior to the Confirmation hearing.

[Plan, Art. I (B) (70)]. The Plan Supplement will contain the Liquidating Trust Agreement.

Because the specific terms of the Liquidating Trustee Agreement are critical for a meaningful

evaluation of potential recoveries for the benefit of creditors, the Committee contends that the

Plan Supplement, along with the Liquidating Trust Agreement, should be submitted earlier than

the ten days prior to the Confirmation hearing currently proposed by the Debtor to enable

creditors sufficient time to evaluate the implementation of the Plan.

**B.      The Plan's Defects Render it Patently Unconfirmable.**

87.     While issues of confirmability are typically heard at plan confirmation, a court

may deny approval of a disclosure statement where the plan it supports is facially unconfirmable.

See, In re Silberkraus, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000) ("[W]here a plan is on its face

nonconfirmable as a matter of law, it is appropriate for the court to deny approval of the

disclosure statement describing the nonconfirmable plan."). See also, Phoenix Petroleum, 278

B.R. at 394 (finding that a disclosure statement can be denied due to nonconfirmability of a

plan); In re Arnold, 471 B.R. 578, 586 (Bankr. C.D. Cal. 2012)(same); In re GSC, Inc., 453 B.R.

132, 157 (Bankr. S.D.N.Y. 2011) (same); In re Bjolmes Realty Tr., 134 B.R. 1000, 1002 (Bankr.

D. Mass. 1991) (same).

**1.      The Plan is not proposed in good faith.**

88.     As detailed above, the D&O Releases fail to meet the standards recognized in this

Circuit for releases of debtor claims against non-debtors. Most notably, there has been no form

of consideration to the Debtor's estates in return for the gratuitous releases to insiders. The Plan

proposes very broad releases solely for the benefit of insiders when they have provided no value

in exchange. The Disclosure Statement does not indicate any valid justification or need for the

D&O Releases that would be in the best interest of the estate or its creditors. Furthermore, the

Debtor has unjustifiably rejected evidence provided by the Committee indicating a basis for

claims to be made against the D&Os. In the absence of any such justification, the only

conclusion that can be reached is that the D&O Releases were inserted at the insistence of the

Debtor's insiders for their sole benefit.

89.     The Plan, as proposed, would not achieve the fundamental fairness the

Bankruptcy Code requires and is not consistent with its objectives and purposes. Under §

1129(a)(3), courts may only confirm reorganization plans proposed in good faith. "[T]he

important point of inquiry is the plan itself and whether such a plan will fairly achieve a result

consistent with the objectives and purposes of the Bankruptcy Code." Those objectives and

purposes include "preserving going concerns and maximizing property available to satisfy

creditors," "giving debtors a fresh start in life," "discourag[ing] debtor misconduct," "the

expeditious liquidation and distribution of the bankruptcy estate to its creditors," and "achieving

fundamental fairness and justice." In re WR Grace, 729 F.3d 332, 346 (3d Cir. 2013) (internal

citations omitted). Insiders and fiduciaries are not supposed to put their interests ahead of

creditors' interests. Misplaced loyalty is a textbook example of debtor misconduct.

90.     The Plan is not confirmable Under § 1129(a)(1) because the Plan violates §

524(e) of the Bankruptcy Code. Section 524(e) of the Bankruptcy Code prohibits the discharge

of debt other than that of the debtor as part of a plan. A plan is not confirmable if it does not

comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). Since

the terms of the Plan violate § 524(e) of the Bankruptcy Code, the Plan is not confirmable.

**2.      The D&O Releases may be viewed as impermissible non-consensual
third-party releases.**

91.     The previous discussion viewed the D&O Releases as releases by the Debtor of any estate claims against the D&Os. However, directors and officers of insolvent corporations, including nonprofits, owe fiduciary duties to its creditors. Creditors have derivative standing to assert actions against the directors and officers for breaches of such fiduciary duties. Thus, the Debtor's proposed D&O Releases may be viewed as a non-consensual, third-party releases, since it would enjoin actions by one non-debtor against another.

92.      "In evaluating releases, courts distinguish between the debtor's release of non-debtors and third parties' release of non-debtors" Washington Mut., 442 B.R. at 352 (citing, In re Exide Techs., 303 B.R. 48, 71-74 (Bankr. D. Del. 2003). Courts use "different analyses to evaluate releases by a debtor of non-debtor third parties and releases by a non-debtor or other non-debtor third parties." Id.

93.     Non-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in "extraordinary cases." Genesis Health Ventures, 266 B.R. at 608, citing Gilbert v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 212 (3d Cir. 2000). In Continental, the Third Circuit did "not establish a rule regarding conditions under which non-debtor releases and permanent injunctions are appropriate or permissible", but determined that the non-consensual release of a non-debtor party in Continental's plan did "not pass muster under even the most flexible tests for the validity of non-debtor releases. The hallmarks of permissible non-consensual releases — fairness, necessity to the reorganization, and specific factual finding to support these conclusions — are all absent here." Id.at 214.

94.     The Disclosure Statement contains no explanation as to why this Chapter 11 might be considered an "extraordinary case" that would warrant the approval of broad third-party releases. Consequently, the D&O Releases, when viewed as non-consensual third-party releases,

fail to meet the steep burden for approval in the Third Circuit. See, <u>Continental</u>, 203 F.3d at 214;

<u>Washington Mut.</u>, 442 B.R. at 351.

95.     Further, the courts that have approved third-party releases typically have done so

with the informed consent of the affected creditors. <u>In re Congoleum Corp.</u>, 362 B.R. 167, 192 n.

20 (Bankr. D.N.J. 2007); <u>In re Spansion</u>, 426 B.R. 114, 144 (Bankr. D. Del. 2010)("Courts have

determined that a third party release may be included in a plan if the release is consensual and

binds only those creditors voting in favor of the plan.")(citations omitted).  Such is not the case

here, as creditors are not given the opportunity to opt out of the releases in connection with Plan

voting.

96.     Thus, when viewed as either debtor releases or third-party releases, the D&O

Releases are facially impermissible and, as such, the Disclosure Statement may not be approved.

> **3.      The Plan is not feasible, and the Debtor is likely to liquidate or need further rehabilitation.**

97.     As the Committee has previously pointed out, the Debtor's Plan is dependent on

the occurrence of a number of contingencies, without which, the reorganization has little

likelihood of succeeding.  These include that:

(a)     The Debtor has no commitment regarding its continued occupancy of the GMC

facility after November 2018.

(b)     The Debtor is not able to assure that CBH will renew its provider agreements for

any amount of time to permit the Debtor to operate properly, and provide a dividend to

unsecured creditors.

(c)     CBH has not agreed and CBH has not stated that it will increase the Debtor's

rates, or continue the back stop.

(d)      The Debtor has no agreement with Blue Cross to provide health benefits at the

expiration of the Blue Cross contact.

Therefore the Debtor's Plan, on its face, is visionary in that it has not obtained the much-

needed operational changes, nor has it obtained agreements necessary for the continued viability

of the Debtor.

## IV.    RESERVATION OF RIGHTS

98.    The Committee reserves its right to supplement this Objection at or prior to the

hearing or continued hearing on the Disclosure Statement and/or to file any Objections to the

Plan or any amended plan.

## V.    CONCLUSION

WHEREFORE, for the foregoing reasons, the Committee respectfully objects to the

Disclosure Statement and requests such other and further relief as is just and equitable, including

the denial of the Disclosure Statement Motion.

Respectfully submitted,


Dated: April 23, 2018              By: */s/ Edmond M. George*
                                        Edmond M. George, Esquire
                                        Michael D. Vagnoni, Esquire
                                        D. Alexander Barnes, Esquire
                                        OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                        Centre Square West
                                        1500 Market Street, Ste. 3400
                                        Philadelphia, PA 19102

                                        *Counsel to the Official Committee of Unsecured
                                        Creditors*